In re Simon B. SANTOS, Debtor.

Victoria Shaw, Plaintiff,

v.

Simon B. Santos, Defendant.

Bankruptcy No. 01–37301.
Adversary No. 01–3622.

United States Bankruptcy Court,
D. New Jersey.

Feb. 2, 2004.

Judith E. Rodner, West Orange, NJ, for Plaintiff.

Robert S. Molnar, Wayne, NJ, for Defendant.

## OPINION

MORRIS STERN, Bankruptcy Judge.

## I. BACKGROUND

Plaintiff, Victoria Shaw, brings this adversary proceeding against the debtor, Simon B. Santos, M.D., pursuant to 11 U.S.C. 523(a)(2)(A).[1] Santos, who filed a chapter 7 bankruptcy petition on June 21, 2001, is said to have defrauded Shaw and to have "committed consumer fraud by using unconscionable commercial practices, deception, fraud, false pretenses, false promises, and misrepresentations"[2] which resulted in substantial damage to Shaw. Trial was conducted on August 28 and 29, and September 24, 2003, the record was supplemented by Stipulation of Counsel of November 5, 2003 ("Stip.") and closing argument was heard on January 23, 2004.

Shaw's claims arise out of Santos' purported false representations regarding the quality of surgical procedures and medical care that would be provided to Shaw in the Dominican Republic. Shaw claims that Santos, a licensed New Jersey physician, offered low-cost plastic surgery in his clinic in Santo Domingo, holding out the high quality of facilities and services available there. Shaw contends that the reality was much different, and that after relying on Santos' misrepresentations, she underwent surgery in Santo Domingo with disastrous results.

Shaw's claims, all emanating from prepetition acts of the debtor, were the subject of a New Jersey Superior Court action, which was stayed by Santos' filing here. Thus, neither liability nor damages were determined in the state court.

At trial of the adversary proceeding, plaintiff's case included testimony from Shaw and three of her friends, who (along

---

1. **11 U.S.C. § 523. Exceptions to discharge**
   (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
   (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

   (A) false pretenses, a false representation, or actual fraud, *other than a statement respecting the debtor's or an insider's financial condition....*

2. Plaintiff's Proposed Conclusions of Law, Docket No. 15, p. 6, § 1 (filed 8/27/03).

with Shaw) met with Santos in Shaw's home in April 1996, in a session where Santos described the cosmetic surgery available in Santo Domingo. Plaintiff also called Dr. Anthony C. Berlet, a board certified plastic surgeon who operated on Shaw after her return from Santo Domingo both to correct the appearance of areas operated on in Santo Domingo and to relieve Shaw of continuous pain resulting from the offshore surgery. Shaw's pain, however, is said to be chronic and not subject to relief by further interventional surgery, and cosmetic remediation has been imperfect at best.

Santos' case included testimony by his wife and himself. He denies any and all misrepresentations, though his case included no affirmative proofs as to the quality of the surgery performed on Shaw, the qualifications of the principal surgeon (who was not Santos), or the quality of overall medical care provided to Shaw in Santo Domingo.

Shaw contends that the fraudulent acts and false statements of Santos were as follows: (1) *inter alia,* at meetings and through promotional material, he represented that, if Shaw traveled to the Dominican Republic for plastic surgery, the techniques, equipment, and facilities available to her there would be the same as were available in the United States; (2) he distributed a promotional brochure to Shaw in New Jersey for the specific purpose of inducing her to go to the Dominican Republic for surgery (at a clinic that he was building), a brochure which misrepresented the quality of the services to be provided; (3) at a meeting with Shaw and her friends, Santos made misrepresentations regarding the facilities and the surgical techniques available to them in the Dominican Republic; (4) the misrepresentations specified that the surgeon or surgeons who would operate on Shaw were up to American standards using American techniques; (5) Santos induced Shaw to undergo plastic surgery in the Dominican Republic by emphasizing the low cost of that surgery; (6) Santos had allowed his medical malpractice insurance to lapse in 1995, but did not advise Shaw at the time of her 1996 surgery that he carried no medical malpractice insurance; (7) Santos led Shaw to believe that he was to be the primary surgeon in Santo Domingo but advised her on her arrival there that he would only be assisting; nevertheless, Santos specifically represented at that time that the primary surgeon who would operate on her was "up to American or New Jersey standards"; (8) though Santos had told Shaw in New Jersey that she would be operated on in Santos' brand new medical clinic, upon her arrival in Santo Domingo, she was advised that the clinic had not yet opened and that the surgery would be performed in a facility which was up to American standards; and (9) at all relevant times, Santos represented that multiple plastic surgery techniques could be performed on Shaw safely, and all in one surgical session.

Santos denies, in general terms, any misrepresentations.

## II. *JURISDICTION*

■ Santos argues that Shaw would turn a garden-variety medical malpractice case (i.e., a "personal injury tort"), into a "consumer fraud," and has thus contrived this exception to discharge adversary proceeding. Moreover, Santos stresses that liquidation of Shaw's fraud claim requires this court to extend itself beyond its jurisdictional limits. Specifically, 28 U.S.C. 157(b)(2)(B), as part of the nonexclusive list of core proceedings for which bankruptcy judges may enter appropriate orders and judgments, provides for "allowance or disallowance of claims against the

estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11." *See also* 28 U.S.C. 157(b)(2)(O). Ultimately, 28 U.S.C. 157(b)(5) provides:

> The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

Shaw contends that this is a matter dealing primarily with dischargeability of a claim, and that this court is authorized to determine the exception to discharge issue. But Shaw's pleadings would have this court go further and liquidate the claim (where damages happen to include alleged personal injury purportedly arising from misrepresentation).

The court concludes that it has jurisdiction over this matter pursuant to 28 U.S.C. 1334 and the Standing Order of Reference of the United States District Court of New Jersey dated July 23, 1984. To the extent that this court will hear this case, it will do so as a fraud exception to discharge proceeding, not as a "personal injury tort." *See Lee–Benner v. Gergely (In re Gergely),* 110 F.3d 1448, 1453–54 (9th Cir.1997) (a debtor-physician's purported misrepresentation as to the necessity for amniocentesis, followed by negligent performance of the procedure, gave rise to a debt deemed to be properly the subject of an exception to discharge adversary proceeding per 523(a)(2)(A) including personal injury damages from misperformed procedure). *See also Britton v. Price (In re Britton),* 950 F.2d 602, 604–05 (9th Cir.1991) (cosmetic surgeon's employee, misrepresenting himself as the physician and thus inducing surgery, was subject to the fraud exception to discharge adversary proceeding, including personal injury damages when surgery by the actual physician was negligently performed); *Church v. Hanft (In re Hanft),* 274 B.R. 917, 921–23 (Bankr.S.D.Fla.2002) (physician failing to disclose that he was practicing with a terminated license and without malpractice insurance or equivalent escrow of assets was subject to the fraud exception to discharge adversary proceeding including personal injury damages for failure to diagnose a tumor).[3] *Consider*

---

**3.** In each of these cases, the "debt" deemed to be "obtained by" the misrepresentation for 523(a)(2) purposes included the resulting personal injuries. Debtor's argument in *Lee–Benner* against exception to discharge was "that the debt is not for money obtained by fraud, but for damages resulting collaterally from an alleged fraud." This effort to narrow the 523(a)(2) scope of "debt" was rejected. 110 F.3d at 1453. *See In re Levy,* 951 F.2d 196, 198 (9th Cir.1991) (523(a)(2)(A) "limits nondischargeability to the amount of benefit to the debtor *or loss to the creditor the act of fraud itself created"*) (cited and quoted in *Lee–Benner, id.,* with emphasis supplied here). *In re Levy,* in turn, was determined by the United States Supreme Court to be *too restrictive* in its reading of "debt" as embodied in

523(a)(2); *Cohen v. de la Cruz,* 523 U.S. 213, 217, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). *Cohen* affirmed the Third Circuit's holding that punitive damages were a nondischargeable damage component of a fraud determination as follows:

> [T]he text of 523(a)(2)(A), the meaning of parallel provisions in the statute, the historical pedigree of the fraud exception, and the general policy underlying the exceptions to discharge all support our conclusion that "any debt ... for money, property, services, or ... credit, to the extent obtained by" *fraud encompasses any liability arising from money, property, etc. that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the*

*Robinson v. Louie (In re Louie)*, 213 B.R. 754, 760–61 (Bankr.N.D.Cal.1997) (Debtor's failure to disclose his HIV-positive status to life partner was determined to be potentially the basis for a fraud exception to discharge adversary proceeding for various damages, though damages based upon fear of contracting AIDS were not allowed).

The matter would thus be "core" within the purview of 28 U.S.C. 157(b)(2)(I) ("Core proceedings include . . . determinations as to the dischargeability of particular debts . . ."). And, Shaw had no choice but to bring the adversary proceeding to protect her claim from discharge.[4] *See* 11 U.S.C. 523(c); Fed. R. Bankr.P. 7001(6).

Though facially "core," this proceeding comes to this court *prior to* any determination of *liability* of Santos to Shaw (and, of course, without the Shaw claim being liquidated). *Lee–Benner, Britton* and *Church* raised the exception to discharge issue after state court judgments (though not necessarily judgments which specified all nondischargeable acts). In *Robinson* the state court proceeding was interrupted. The bankruptcy court delved deeply into the state court causes of action to decide what *would be* nondischargeable, but the inference in the case is that the state court action would proceed.

The Cohen Opinions are based on a complaint which brought to the bankruptcy court *both* the discharge issues and the liability/liquidation issues. The plaintiffs, tenants of debtor-landlord, alleged a violation of the New Jersey Consumer Fraud Act based upon the debtor-landlord's overcharging of rent in violation of a local ordinance. The bankruptcy court decided the full range of issues attributing liability to the landlord's actions. First, under common law fraud per 523(a)(2)(A) of the Bankruptcy Code, the court excepted those acts from discharge. Then, in a separate hearing centering on the Consumer Fraud Act claim, the court determined that there was liability under the Act and liquidated the claim (including punitive damages). Exception from discharge of the punitive damages was the issue on the appeal; however, the rendering of complete judgments (i.e., exceptions to discharge, liability and liquidation of damages) by the bankruptcy court was not questioned by either the Third Circuit or the Supreme Court. To the same effect *see In re Lang*, 293 B.R. 501, 516–17 (10th Cir. BAP 2003) ("bankruptcy courts have the jurisdiction to award money damages in a § 523(a) proceeding"); *In re Kennedy*, 108 F.3d 1015, 1017–18 (9th Cir.1997); *In re Porges*, 44 F.3d 159, 163–64 (2d Cir. 1995); *In re McLaren*, 3 F.3d 958, 966 (6th

---

*value obtained by the debtor.* [523 U.S. at 223, 118 S.Ct. 1212, emphasis added.].
*See De La Cruz v. Cohen (In re Cohen)*, 185 B.R. 171 (Bankr.D.N.J.1994); *De La Cruz v. Cohen (In re Cohen)*, 185 B.R. 180, 188–89 (Bankr.D.N.J.1995); *aff'd*, 191 B.R. 599 (D.N.J.1996); *aff'd*, 106 F.3d 52 (3d Cir. 1997); *cert. granted*, 521 U.S. 1152, 118 S.Ct. 30, 138 L.Ed.2d 1060 (1997); *aff'd* 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) (hereinafter referred to collectively as the "Cohen Opinions.")

4. Nevertheless, Shaw did have the option, but apparently never chose, to move for stay relief

to pursue her case in the Superior Court of New Jersey or in the district court. Given that this adversary proceeding has been pending since September 17, 2001, this court moved the trial in an effort to close out both the immediate proceeding and the aging chapter 7 case. Therefore, the scheduled trial in the bankruptcy court was undertaken notwithstanding the atypicality of resolving the § 523(a)(2)(A) aspect before the claim is *liquidated.* Counsel were advised by the court at the pretrial stage as well as during the trial that liquidation of the claim was problematic in terms of jurisdiction.

Cir.1993); *In re Hallahan*, 936 F.2d 1496, 1508 (7th Cir.1991).

█ While the Cohen Opinions make it clear that bankruptcy courts are authorized *both* to determine *liability* and to *liquidate* certain claims in the course of deciding exception to discharge adversary proceedings, those opinions did not deal with any aspect of personal injury. For two reasons, this court is constrained to stop short of *liquidating* the personal injury aspects of the plaintiff's claim. *First*, liquidation is best left to the district court or a state court proceeding, where there is greatest expertise in evaluating damages caused by specific surgeries. *See* 28 U.S.C. §§ 157(b)(5) and 1334(c)(1) and (2).[5] *Second*, liquidation of Shaw's personal injury claim in bankruptcy would either actualize or too closely approximate the liquidation of a "personal injury tort" as that term is used in 28 U.S.C. §§ 157(b)(2)(B) and (b)(2)(O). And, such liquidation might, along with a determination of fraud *liability*, become the trial of a "personal injury tort claim" under 157(b)(2) and (5). Those trials are beyond the subject matter jurisdiction of this court.

Conceptually, one could reason that the fraud exception to discharge could be tried to conclusion and full liquidation by this court, even where personal injury serves as the basis for *damages*. The fraud case,

by this reasoning, would not be a "personal injury tort" as that term is used in 157(b)(2)(B), (b)(2)(O), and (b)(5). However, "personal injury tort" remains an opaque term in the Bankruptcy Code. *See generally In re Ice Cream Liquidation, Inc.*, 281 B.R. 154, 160–63 (Bankr.D.Conn. 2002).

Legislative history is not enlightening, other than generally to denote that the "personal injury tort claim" exception to 157 bankruptcy court jurisdiction includes a "narrow range" of claims. *See* Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 1984 U.S.C.C.A.N. (98 Stat. 333) 576, 580 (per Congr. Kastenmeier). The various arguments for a narrow or broad reading of the term are well-capsuled in *In re Ice Cream Liquidation, id.*, though the debate there focuses more on whether physical trauma is a required element of "personal injury tort." The case dealt with claims of sexual harassment and, in a different context,[6] opted for *conditional* acceptance of the broader view of the key term (i.e., no physical trauma need be established).

*Sub judice*, physical trauma is present though in a fraud setting. While fraud is included under the umbrella of "tort,"[7] it is not in normal parlance a "personal injury tort." *More pointedly, fraud determinations for purposes of 523(a)(2)(A) excep-*

---

5. Jury trial rights are not implicated in the trial of this fraud exception to discharge case. No jury has been demanded by either party. FED. R. BANKR.P. 9015(a) and (b). Nor, given the limited scope of the proceeding, is one warranted. *See In re Hashemi*, 104 F.3d 1122, 1124 (9th Cir.1996) (no Seventh Amendment right to jury trial in nondischargeability actions); *In re Hallahan*, 936 F.2d at 1499; *In re Fink*, 294 B.R. 657, 659 (W.D.N.C.2003); *In re Hawkins*, 231 B.R. 222, 235–36 (D.N.J.1999); *In re Fineberg* 170 B.R. 276, 280 (E.D.Pa.1994); *In re Devitt*, 126 B.R. 212 (Bankr.D.Md.1991); In *re Perry*, 111 B.R. 861 (Bankr.C.D.Ca.1990).

6. Creditors holding the sexual harassment claims against a corporate chapter 11 debtor (as a successor in liability) sought stay relief to continue litigation in state court; the bankruptcy court determined the claims (and, particularly, the successor liability claims) were in the nature of "personal injury tort claims," lifted the stay and, further, abstained.

7. *See, e.g., Field v. Mans*, 516 U.S. 59, 71 n. 9, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) ("We construe the terms in 523(a)(2)(A) to incorporate the general common law of torts . . .").

*tions to discharge are specified to be at the core of this court's regular duties.* 28 U.S.C. 157(b)(2)(I). To narrow those duties by establishing a category of fraud cases (i.e., those with physical trauma) as being beyond this court's subject matter jurisdiction (per 28 U.S.C. 157(b)(5)), is a questionable restriction.[8] In effect, 157(b)(2)(I), unrestricted on its face in establishing as core "determinations as to the dischargeability of particular debts," would be rewritten to include the 157(b)(2)(B) restriction on allowance or disallowance of claims (i.e., liquidation of personal injury tort claims is excluded from the core function of allowance and disallowance).

Even in the "broad" view decision of *Hansen v. The Borough of Seaside Park (In re Hansen)*, 164 B.R. 482, 486 (D.N.J. 1994), "fraud" was not enumerated as being included in the key term. Nevertheless, *Hansen, quoting Boyer v. Balanoff (In re Boyer)*, 93 B.R. 313, 317–18 (Bankr. N.D.N.Y.1988), seemingly equates "personal injury tort" with "a remedy in the form of an action for damages" over a broad range "of private or civil wrongs or injuries." Whether this rather unlimited conflation of causes of action with remedies comports with the intent of the Code, is open to debate. *Compare and contrast Littles v. Lieberman (In re Littles)*, 75 B.R. 240, 242 (Bankr.E.D.Pa.1987).[9]

The cases cited to this point that tend to define broadly "personal injury tort," were not exception to discharge adversary proceedings (i.e., core per 28 U.S.C. 157(b)(2)(I)). *In re Ice Cream Liquidation* arose in the context of a stay relief motion (core per 157(b)(2)(G)) and an objection to the claim of successor liability for sexual assault (core as implicating the *restricted* claim allowance process per 157(b)(2)(B)). *Hansen* (and for that matter, *Littles*), were noncore "related to" actions brought by the debtor. Hence, these cases were not supported in jurisdictional terms by the breadth (i.e., unrestricted nature) of 157(b)(2)(I). Is the "unrestricted" core provision supporting the excep-

---

8. *In re Ice Cream Liquidation, Inc.*, 281 B.R. at 161, makes the point that the "personal injury tort claims" exception to this court's subject matter jurisdiction is not constitutionally required (i.e., the exception is not a restriction mandated by *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982)). Rather, it was said to be Congress' "response to lobbying by the personal injury tort bar." *Id. See In re Dow Corning Corp.*, 215 B.R. 346, 353–54 (Bankr.E.D.Mich.1997). And, unlike *Marathon*, the matter at bar was initiated by the creditor-plaintiff against the debtor; though 523(c) of the Bankruptcy Code requires the creditor to bring the adversary proceeding, there was ample opportunity to move for relief from the stay to proceed in state court, or to have the reference withdrawn as to this matter. Plaintiff chose to remain in this venue and to have the discharge issue resolved *first;* in fact, that issue is not soluble without a decision on *liability* (at least as to common law fraud). *Marathon* was a different case.

9. *Littles* and *Hansen* dealt with statutory causes of action asserted by debtors. *The noncore "related to" jurisdiction of the bankruptcy court was being tested in each case. See* 28 U.S.C. 157(c)(1). *Littles* held that a chapter 13 debtor's cause of action under the Fair Debt Collection Practices Act, 15 U.S.C. 1692, *et seq.* ("FDCPA") did not require proof of damage *as an element of that cause. See Crossley v. Lieberman*, 90 B.R. 682 (E.D.Pa. 1988) (relating to the same debt-collector, and utilizing part of the *Littles* transcript); *aff'd*, 868 F.2d 566 (3d Cir.1989). *Hansen* included allegations by a chapter 11 *debtor* of Civil Rights Act violations, 42 U.S.C.1983 and 1985, which were viewed as the statutory embodiment of tort actions. *Littles* thus found that it had subject matter jurisdiction to hear the FDCPA cause, while *Hansen* reversed the bankruptcy court's exercise of subject matter jurisdiction over the Civil Rights Act case.

tion to discharge adversary proceeding sufficient on its face to justify a bankruptcy court decision which determines not only exception to discharge, but also *liability* and the *liquidation value* of any claim asserting personal injury damages? Alas, as to liquidation, the personal injury tort restriction of 157(b)(2)(B) would circle back into the picture. And, this court's jurisdiction in the restricted *claim allowance process* would again appear to rest either on *Hansen*-like broad stroke readings or hairsplitting distinctions in defining the key term, "personal injury tort." (Such fine distinctions could only be made by attempting to differentiate between fraud that leads to personal injury damages, and other torts more commonly associated with personal injury.)

To complete the analysis, personal injury tort should also be considered in the related context of 523(a)(6). There, an exception to discharge is provided "for willful and malicious injury by the debtor to another entity or to [that entity's] property." Adversary proceedings under this exception to discharge encompass intentional torts, which often involve personal injury. Determination of liability as well as liquidation of those cases would seem readily to fall outside the subject matter jurisdiction of this court (157(b)(5)), notwithstanding the core aspects of 523(a)(6) as included in 28 U.S.C. 157(b)(2)(I). Nevertheless, in the 523(a)(6) case of *Swarcheck v. Manidis (In re Manidis)*, 1994 WL 250072 (Bankr.E.D.Pa.), the bankruptcy court maintained subject matter jurisdiction—up to a point.

*Manidis* involved a claim *against the debtor* for sexual assault, said to qualify for the 523(a)(6) "willful and malicious injury" exception to discharge. The pending state court action was interdicted by the debtor's filing of the bankruptcy petition. Similar to the current case, the plaintiff in *Manidis* requested *liquidation* of the claim by the bankruptcy court, along with the determination of exception to discharge. A trial was conducted (again, as in the matter at bar).

The *Manidis* court concluded that the 523(a)(6) elements were established, but 28 U.S.C. 157(b)(5) denied the court "subject matter jurisdiction to liquidate that claim." *Id.* at *5. Among other cases, *Hansen* and *Littles* were cited for the proposition (*quoting Hansen*, 164 B.R. at 486) that proof of damages "to an individual's person and any invasion of personal rights" tends to define "personal injury tort" for 157(b)(5) purposes. Though *Manidis* did not expressly adopt the *Hansen* definition, the court found that plaintiff's *state court* action "requires proof of damages and is a personal injury tort action within this definition." *Id.*

In effect, *Manidis* tried the liability issues relating to the 523(a)(6) exception (i.e., the willfulness and malicious elements), excising damages while isolating the exception to discharge cause from the tort. (These liability issues nevertheless appear to have been identical to certain of those pending in the state court action.) Determination of liability, without more, thus was said to have preserved subject matter jurisdiction in this personal injury intentional tort case.[10]

Separating liability from resulting personal injury damages in the immediate fraud case would seem to be consistent with the procedure followed in both *Manidis* and the nonpersonal injury *Cohen* case (*see* 185 B.R. 171, where the exception to

---

**10.** *Manidis* is not officially reported, and is cited only in *In re Hollida*, 212 B.R. 831 (N.D.W.Va.1997).

discharge case was tried apart from the subsequent damage hearing). For this court, the questions are: Did Santos intentionally misrepresent the quality of medical services and facilities available in Santo Domingo for plastic surgery? If so, did Shaw reasonably rely on those misrepresentations? If so, did those misrepresentations lead to Shaw's pain and disfigurement? The extent of the pain and disfigurement need not be determined in order to make the 523(a)(2)(A) assessment—though a finding of liability for fraud might well result in certain issue preclusion. Nevertheless, no constitutional limitation on this court prohibits its trying the fraud-liability case, nor do personal injury damages have to be adjudged here. This parsing of discharge and liability from damages would seem to be a more satisfying functional approach to subject matter jurisdiction than ruminating about whether or not fraud is commonly conceived of as a "personal injury tort."

As pointed out earlier, unlike fraud proofs, personal injury damage proofs and valuations are not the everyday diet of this court. The district court or the state court are better able to decide damages (including potential for damages based upon mental anguish [11]).

In conclusion, this court has subject matter jurisdiction to decide the fraud-based exception to discharge issues presented here, issues inextricably intertwined with the liability issues presented earlier to the Superior Court, but never tried there.[12] Damages not readily within the expertise of this court given the personal injury-based remedy sought—i.e., compensation for disfigurement, other bodily injury and trauma, and pain and suffering from purported botched plastic surgery, as well as a punitive amount—will not be decided. Assuming, *arguendo*, that this court has subject matter jurisdiction to decide the damage issues, it will abstain in favor of the district court or state court if necessary. 28 U.S.C. 1334(c).

## III. *FRAUD STANDARD*

Shaw pled both common law fraud and violation of the New Jersey Consumer Fraud Act.[13] Santos maintains that the Act has no application to New Jersey medical doctors because physicians are regulated

---

**11.** Emotional distress damages in fraud cases not involving physical injury is an uncertain area of the law. *See, e.g., McConkey v. AON Corp.*, 354 N.J.Super. 25, 58–64, 804 A.2d 572 (App.Div.2002). The physical injury aspects of a fraud case would seem to justify the associated emotional distress measure of damages (consideration of which is best left to another court). However, note the developing law of emotional distress damages associated with 11 U.S.C. § 362(h) stay violations. *See In re Stinson*, 295 B.R. 109, 122 (9th Cir. BAP 2003); *Aiello v. Providian Fin. Corp.*, 239 F.3d 876, 880 (7th Cir.2001); *Fleet Mortgage Group, Inc. v. Kaneb*, 196 F.3d 265, 269–70 (1st Cir.1999); *United States v. Holden*, 258 B.R. 323, 328 (D.Vt.2000); *In re Littles*, 75 B.R. at 242; *In re Wagner*, 74 B.R. 898, 905 (Bankr.E.D.Pa.1987).

**12.** As will be seen, common law fraud is at issue *sub judice*, while the Consumer Fraud Act was pled both here and in the state court. Proof of the former implicates the latter. *In re Cohen*, 185 B.R. at 185–88.

**13.** N.J.S.A. 56:8–2 provides in pertinent part:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice. . . .

pursuant to professional licensure requirements of the State. Defendant's position is contrary to the recent Appellate Division case of *Macedo v. Dello Russo*, 359 N.J.Super. 78, 819 A.2d 5 (App.Div.2003), a case presently pending before the New Jersey Supreme Court.

■ However, the applicability of the Consumer Fraud Act to the immediate case is not a critical part of this court's consideration. Exception to discharge based upon 11 U.S.C. 523(a)(2)(A) requires a showing of *actual fraud*, not merely fraud that would be implied in law. *Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir.1997); *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir.1995); *Rembert v. AT & T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir.1998); *Thul v. Ophaug (In re Ophaug)*, 827 F.2d 340, 342 n. 1 (8th Cir.1987); *Public Finance Corporation of Redlands v. Taylor (In re Taylor)*, 514 F.2d 1370, 1373 (9th Cir.1975); *Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir.1986); *Morin v. McIntyre (In re McIntyre)*, 64 B.R. 27, 29 (D.N.H.1986). Actual fraud for § 523(a)(2)(A) purposes is proven by establishing each of the following elements: (1) that the debtor obtained money, property or services through a material misrepresentation; (2) that the debtor, at the time of the transaction, had knowledge of the falsity of the misrepresentation or reckless disregard or gross recklessness as to its truth; (3) that the debtor made the misrepresentation with intent to deceive; (4) that the plaintiff reasonably relied on the representation; and (5) that the plaintiff suffered loss, which was proximately caused by the debtor's conduct. *See, e.g., McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir.2001); *AT & T Universal Card Services v. Mercer (In re Mercer)*, 211 F.3d 214, 216 (5th Cir.2000); *Rembert*, 141 F.3d at 280; *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir.1987); *In re Britton*, 950 F.2d at 604; *Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577, 1579 (11th Cir.1986); *Starr v. Reynolds (In re Reynolds)*, 193 B.R. 195, 200 (D.N.J.1996); *Trump Plaza Associates v. Poskanzer (In re Poskanzer)*, 143 B.R. 991, 999 (Bankr.D.N.J.1992); *Criimi Mae Services Limited Partnership v. Hurley (In re Hurley)*, 285 B.R. 871, 875 (Bankr.D.N.J.2002); *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610, 691 A.2d 350 (1997); *Jewish Ctr. of Sussex v. Whale*, 86 N.J. 619, 624, 432 A.2d 521 (1981).[14]

Application of the five-element common law standard *sub judice* without further recourse to the State Act will suffice for current purposes since (i) liquidation is not at issue here, (ii) a determination of exception to discharge would carry forward that exception to any punitive damages ulti-

---

14. *See also Gem Ravioli, Inc. v. Creta (In re Creta)*, 271 B.R. 214, 217 (1st Cir. BAP 2002); *Citibank South Dakota v. Dougherty (In re Dougherty)*, 84 B.R. 653, 655 (9th Cir. BAP 1988); *Lang v. Lang (In re Lang)*, 293 B.R. 501, 514 (10th Cir. BAP 2003); *Webber v. Giarratano (In re Giarratano)*, 299 B.R. 328, 2003 WL 22077851 *2 (Bankr.D.Del.2003); *Heer v. Scott (In re Scott)*, 294 B.R. 620, 628 (Bankr.W.D.Pa.2003); *Commonwealth Land Title Insurance Company v. Raisley (In re Raisley)*, 287 B.R. 639, 641 (Bankr.W.D.Pa.2003); *Gordon v. Bruce (In re Bruce)*, 262 B.R. 632, 636 (Bankr.W.D.Pa.2001); *South-* *east Bank v. Hunter (In re Hunter)*, 83 B.R. 803, 804 (M.D.Fla.1988); *Automotive Finance Corporation v. Vasile (In re Vasile)*, 297 B.R. 893 (Bankr.M.D.Fla.2003); *Namvar v. Baker (In re Baker)*, 298 B.R. 815 (Bankr.S.D.Fla. 2003); *Redmond v. Finch (In re Finch)*, 289 B.R. 638, 643 (Bankr.S.D.Ohio 2003); *Graffice v. Grim (In re Grim)*, 293 B.R. 156, 163 (Bankr.N.D.Ohio 2003); *Hong Kong Deposit and Guaranty Co. v. Shaheen (In re Shaheen)*, 111 B.R. 48, 51 (S.D.N.Y.1990); *Visotsky v. Woolley (In re Woolley)*, 145 B.R. 830, 833 (Bankr.E.D.Va.1991).

mately assessed (*see Cohen,* 523 U.S. at 223, 118 S.Ct. 1212), and (iii) proof of a violation of the common law standard would almost surely establish a State Act violation if such violation need be determined in the future. (As to the latter point, *see Gennari, supra,* and *Cohen,* 185 B.R. at 176–77 and 185 B.R. at 186–88.)

■ Therefore, in order for plaintiff to prevail here (that is, to establish the fraud exception to discharge for her unliquidated claim), she must establish the five elements of actual fraud, each by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

## IV. UNCONTESTED AND DISPUTED FACTS

### A. Overview—Uncontested Facts.[15]

1. Shaw had heard of Santos, and some time in or around March 1996, sought him out for a consultation regarding cosmetic plastic surgery. 1T86–20 to 1T87–6; 1T88–8 to 13; 1T90–17 to 25; 1T93–14 to 1T94–1 to 1T95–16.

2. After telephone contact with Santos' office and, perhaps, Santos, a brochure (P–1), was telefaxed to Shaw by Santos' assistant. 1T88–5 to 13; 1T91–3 to 10.

3. The brochure mentioned a new private surgical clinic ("Centro Médico Internacional Santiago" or "CEMIS") in Santo Domingo, Dominican Republic, in which Santos had and has a substantial interest and which he apparently controls. 1T7–2 to 13; 1T10–12 to 1T12–23.

4. Santos, a general surgeon in New Jersey practicing since 1978, sold his practice in 1994 and became inactive as a physician in this country from that time until 1997; in 1995 he allowed his medical malpractice insurance to lapse. 1T14–2 to 10; 1T15–9 to 11; 1T16–13 to 22; 1T17–25 to 1T18–3; 2T207–23 to 24.

5. Santos had never performed plastic surgery. His experience in that specialty was limited to assisting on approximately ten to fifteen occasions and some course work. Santos took two courses in cosmetic surgery at the Graduate School Hospital of Philadelphia. The first course in liposuction surgery was held in 1987. The second was held in 1989 and lasted about two weeks. Stip. 68–21 to Stip. 69–4; Stip. 69–17 to 24; Stip. 71–11 to 14; Stip. 20–19 to Stip. 121–17; Stip. 122–14 to Stip. 123–7; Stip. 126–11 to Stip. 127–1; Stip. 127–20 to Stip. 128–13.

6. Apparently, Santos' medical practice activities in the 1994–97 period centered on CEMIS, which opened June 21, 1996. 1T8–24 to 1T9–10; 1T12–15 to 1T13–18.

7. The brochure received by Shaw in March 1996 emphasized plastic surgery techniques. It provided a price list introduced under a boldfaced-type heading **"PLASTIC SURGERY,"** announcing:

> Dr. Santos together with a selective [sic] group of plastics [sic] surgeons in Santo Domingo, Dominican Republic, is pleased to offer the cost of the following procedures. . . .

2T213–8 to 2T214–16.

8. The brochure is *not* specific to CEMIS, but rather announces the services of **"SIMON B. SANTOS, M.D.," "SURGERY** and other medical services. . . . "

9. Under the category of **"IMPORTANT INFORMATION,"** P–1 provides:

> Dr. Simon B. Santos, M.D., is pleased to inform, that now he is offering the ser-

---

**15.** The following are factual statements which are affirmatively acknowledged by both parties, or asserted by one and not contested by the other. References to "1T," "2T," and "3T" are to the trial transcripts for August 28 and 29, and September 24, 2003, respectively.

vices of General Surgery, Laparoscopic Surgery (without opening the patient), Plastic Surgery and the services of all the others [sic] medical specialties, together with others [sic] medical doctors, located in Santo Domingo, Dominican Republic; all affiliated to the following health care centers (equipped with american tecnology [sic] and up to american standards): Centro Médico Dominicano, Clínica Independencia, Centro de Ciruga Integrada, *Centro Médico Internacional Santiago.* [Emphasis added.]

10. In or about early April 1996 Shaw met with Santos (and his wife) initially in a diner in Clifton, New Jersey, where they discussed Shaw's desire for plastic surgery; there it was agreed that Shaw would arrange for a meeting or information session to be held at Shaw's home with her friends to be in attendance (as potential plastic surgery candidates). 1T96–22 to 1T97–25; 1T32–10 to 14; 2T170–23 to 2T171–9; 2T215–9 to 2T216–2; 2T218–7 to 14; 2T218–21 to 25; 2T220–15 to 22.

11. The meeting in Shaw's home occurred shortly after the diner meeting; a number of Shaw's friends attended (including trial witnesses Menichella, Calderio and Mann). By all accounts, Santos described the CEMIS facility and the low cost plastic surgery available in Santo Domingo. Santos met (on an individual basis and in a Shaw bedroom) with Shaw and each friend and looked at or examined them in the context of their specific interests in cosmetic plastic surgery; these viewings or examinations took only a few minutes and Santos does not recall making any notes of his observations or findings. 1T98–15 to 25; 1T99–6 to 23; 1T100–1 to 15; 1T100–16 to 1T101–19; 1T25–13 to 17; 1T35–1 to 8; 1T36–22 to 1T37–1; 1T38–24 to 1T39–15; 1T50–1 to 1T51–6; 1T54–2 to 17; 1T74–4 to 5; 1T75–13 to 20; 2T219–1 to 23; 2T220–15 to 22; 2T222–15 to 2T223–4; 2T224–6 to 22.

12. By all accounts, at the Shaw home Santos represented to Shaw and her friends that the facilities, techniques and medical personnel available to them in Santo Domingo were up to American standards. Shaw then or shortly thereafter agreed to submit herself to Santos' care for plastic surgery in the Dominican Republic. Shaw questioned Santos specifically about the methods that would be used in her surgery, and Santos repeated his representation that all techniques would be up to American and New Jersey standards. 1T107–2 to 13; 1T36–7 to 12; 1T25–18 to 22; 1T26–7 to 10; 1T51–9 to 12; 1T52–4 to 8; 1T26–11 to 18; 1T28–16 to 1T29–20.

13. Shaw arrived in Santo Domingo on May 24, 1996; she was met by Santos and his wife. Shaw was taken by Santos that evening to meet with Dr. Cabral, who would perform the surgery. Santos assured Shaw that Dr. Cabral would perform her surgery up to both New Jersey and American standards. 1T28–24 to 1T29–25; 1T118–7 to 15; 1T120–22 to 121–15; 1T27–14 to 1T28–14; 2T189–6 to 14; 3T26–7 to 11.

14. On May 25, 1996, Shaw underwent surgery, performed by Dr. Cabral and assisted by Santos. The surgery was performed in the hospital known as "Centro Médico Bellas Artes" (not the CEMIS clinic). 1T112–1 to 9; 1T124–7 to 15; 2T189–21 to 2T190–14; 2T191–3 to 10.

15. The surgery performed on Shaw in Santo Domingo included an abdominoplasty ("tummy tuck"), plus liposuction on her chest, flanks, arms, and legs. 2T13–15 to 23; 2T57–5 to 10; 1T124–3 to 5.

16. Years before the Santo Domingo plastic surgery, Shaw had had gall bladder surgery (evidenced by a scar across her

midsection). 1T163–19 to 1T164–12; 1T166–14 to 16.

17. Shaw left the Santo Domingo hospital on or about May 27, 1996 and was taken to a hotel by Santos; there, a Santos relative served as an aide to Shaw. 1T125–7 to 14; 1T131–19 to 1T132–4; 2T202–6 to 2T203–16.

18. Shaw suffered after the May 25, 1996 surgery, experiencing nausea, diarrhea, weakness, pain, severe headache, and dizziness. 1T124–22 to 6; 1T125–17 to 1T126–10.

19. On or about May 31, 1996, Santos took Shaw from the hotel to his home, where she stayed until June 4, 1996. 1T133–20 to 1T134–19; 2T204–9 to 16; 1T138–22 to 25.

20. On June 4, 1996, Shaw flew home against Santos' advice. 1T138–22 to 25; 1T140–7 to 25; 1T141–1 to 25; 2T205–15 to 25.

21. Shaw's hemoglobin count was in the seven range both when tested in Santo Domingo after surgery, and shortly after her arrival in New Jersey; a normal count is twice that. 1T138–22 to 25; 1T140–7 to 25; 1T141–1 to 25; 2T205–15 to 25.

22. On June 6, 1996 and after collapsing, Shaw was taken by ambulance to St. Mary's Hospital, Passaic, where she received blood transfusions and was treated for infection in the area of her abdominoplasty. Shaw was discharged from this hospital on June 9. 1T148–6 to 1T149–8; 2T23–3 to 15.

23. On June 27, 1996, Shaw was again admitted to St. Mary's Hospital, where she underwent surgery in the area of the abdominoplasty, again related to infection. She was discharged on June 30. 1T157–9 to 1T158–3.

24. Shaw was not able to return to work until on or about August 1, 1996.

She has suffered and continues to suffer from pain ("a tugging") in her abdomen, which is now said to be "chronic." 1T159–23 to 1T160–7; 1T160–15 to 1T161–15; 2T33–22 to 23; 2T50–17.

25. Beginning in June, 1997, Shaw underwent corrective surgery performed by Dr. Berlet at General Hospital Center at Passaic. These surgeries (including those of July 1998 and December 1998) were efforts to correct the appearance of the areas operated on in Santo Domingo (i.e., to correct "divots," "dents" and other gross irregularities), and to try to alleviate Shaw's pain. Pain is ongoing; aesthetics following Berlet's corrective surgery show some improvement. 1T162–20 to 1T163–1; 1T182–7 to 1T183–6; 1T185–14 to 186–21; 1T202–15 to 1T203–22; 2T33–17 to 2T34–14; 2T36–24 to 2T37–5; 2T37–24 to 2T38–22; 2T39–16 to 2T40–21; 2T45–13 to 2T46–18; 2T50–15 to 2T52–7.

26. Shaw has sought pain management medical services, resulting in her hospitalizations in Passaic Beth Israel Hospital on February 9, March 18, and April 24, 2002. 1T187–3 to 1T188–4; 2T9–9 to 15.

27. Liposuction in Shaw's flank areas performed at the same time as her abdominoplasty (tummy tuck), in combination with her preexisting gall bladder scar, assured that the blood supply to the abdominal area would be cut off, causing complications (necrosis). 2T62–3 to 63–9.

28. The surgery performed on Shaw in Santo Domingo was below the American standard of care and, given Shaw's condition, a clearly bad practice. 2T64–1 to 12.

29. Santos never advised Shaw that Santos' medical malpractice insurance had lapsed. 1T25–23 to 1T26–5; 1T26–2 to 5; 1T100–11 to 15; 1T52–11 to 1T53–11; 1T61–2 to 5; 1T77–5 to 8.

30. Santos represented to Shaw and her friends that, if they came to his clinic,

he, as a licensed New Jersey doctor, would supervise what happened to them, and that, as owner of the clinic, he would make sure that they were taken care of properly. 2T221–10 to 21; 2T226–14 to 2T227–4.

31. Shaw maintains that, had she known that the CEMIS clinic was not ready to receive patients, that the surgery performed on her was not up to American standards, or that clinic aftercare would not be provided as promised, she would not have gone to the Dominican Republic for surgery. 1T129–14 to 17; 1T129–24 to 1T130–12; 1T131–10 to 16.

## B. *Key Disputed Facts.*

Among the factual disputes evident from the conflicting testimony of Shaw and Santos, are the following:

### 1. *Santos as the surgeon.*

Shaw and her friends, Mann, Calderio and Menichella, contend that at the meeting in Shaw's home Santos led them to believe that he would be performing their cosmetic surgeries in the Dominican Republic. (1T67–13 to 22; 1T72–14 to 20; 2T101–16 to 2T102–15.)

[Shaw] He said he would be there to guide and assist in the surgery.

. . .

When he—when he said "guide and assist," I thought he was the surgeon and he was going to assist the other doctors and tell them what to do. (2T102–8 to 14.)

[Mann] He stated he would be performing the surgery. That I remember clearly. (1T47–15 to 22.)

Santos swears that he told the women only that he knew surgeons in the Dominican Republic and that he could assist them in finding qualified surgeons there. (2T174–9 to 17; 2T177–2 to 8.) He also swears that he told Shaw, during his exam-

ination of her in her home, that Dr. Cabral would be the surgeon responsible for her operation. (2T179–7 to 12.) Shaw maintains that she never heard of Dr. Cabral until after she had arrived in the Dominican Republic. (2T103–4 to 5.)

### 2. *CEMIS as the site of the surgery.*

Shaw and her friends contend that Santos told them their surgeries would be performed in his newly constructed clinic. (1T106–12 to 21; 1T34–20 to 1T35–5; 1T43–10 to 21; 1T50–20 to 1T51–4.)

[Calderio] . . . it was going to be a new clinic. We were actually going to be the first people in this facility. It was just very reassuring, what was going to be done. That's why I did commit that day. (1T56–6 to 13.)

[Menichella] Okay. He was, well, I don't want to say selling us, but he was telling us that it was going to be a brand new hospital . . . if we decide to have the operation, by that time it should be completed because it was almost fully completed. (1T70–14 to 21.)

Santos contends that he told the women that CEMIS was still under construction, and that arrangements for surgery were not dependent on the availability of the clinic. (2T177–9 to 14.) Yet, he acknowledges representing to these women that if they came to the Dominican Republic to have cosmetic surgery, it would be done at the new facility that was under construction. (1T24–24 to 1T25–2; 2T226–4 to 10.) Santos further acknowledges telling the women that it would be good for them to come to his clinic because, as the owner of the facility, he could supervise and make sure that they were all taken care of properly. (2T226–14 to 227–4.)

Shaw swears that in the several phone conversations she had with Santos before departing for the Dominican Republic, he never told her that his clinic was not

ready. (1T109–21 to 1T110–7; 1T112–14 to 22.) She claims that the first time she heard that the clinic was not ready was after she arrived in the Dominican Republic. (1T119–8 to 12.)

Santos maintains that he told Shaw prior to her departure from the United States that his clinic had not been completed and that her surgery would take place in another location. (2T183–3 to 18; 2T236–3 to 8.)

### 3. *Shaw as a candidate for three procedures to be performed in a single session.*

Shaw testified that Santos examined her and told her that she was a candidate for the proposed three surgeries in which she was interested: abdominoplasty and liposuction of her abdomen, arms and legs.

[Shaw] Dr. Santos examined my stomach, the areas I was interested. He examined my legs, which I—my knees, which I felt were too fat. He examined my arms and he told me that I was a candidate for those three surgeries. (1T101–5 to 1T102–3.)

Santos acknowledges that he examined Shaw (2T178–19 to 25; 2T222–15 to 17), however, he contends that he told Shaw that the final word about the specific procedures and techniques would come from Dr. Cabral. (2T179–7 to 12.)

### 4. *Offer of a price break if a group of women decided to travel to the Dominican Republic for their surgeries.*

Shaw swears that Santos offered her a price break on her surgery if she could get a large enough group to attend the presentation at her home.

Q. [Directed to Shaw] After he [Dr. Santos] told you you were a candidate for all three surgeries, what

other discussions, if any did you have?

. . .

A. Judge, I discussed price with him and he gave me a price, and then he said, I'll lower your price if you can get someone else or whoever to go. I'll make your price lower for having other people go. (1T102–8 to 17.)

Shaw's friends also contend that Santos offered them a group rate reduction. (1T41–5 to 22; 1T49–24 to 1T50–7.)

[Menichella] . . . He says, and that's how the prices are going to be based individually on what we needed, and it would definitely (sic) half or less. The more of us if we would have signed up that night, say every one of us signed up, it would be even cheaper, you know. It was based on how many committed that night . . . I do remember that. (1T71–25 to 1T26–6.)

Santos does not believe that he offered price reductions to Shaw and her friends. (2T218–15 to 20.)

### 5. *Basis for cheaper surgery in the Dominican Republic.*

Shaw and her friends swear that Santos told them the cost of the surgery in the Dominican Republic would be almost half that of the same surgery in the United States for a variety of reasons having nothing to do with his lack of medical malpractice insurance.

[Shaw] He [Dr. Santos] said the exchange rate was cheaper, taxes, salary. Just everything here was cheaper and it [the surgery] was going to be at least half the price it would be here. (1T100–11 to 15.)

Q. [Directed to Menichella] . . . when Dr. Santos was explaining to you why it was so cheap to go to the

Dominican Republic and have these surgeries did he ever mention medical malpractice insurance?

A. No. (1T77–5 to 8.)

Q. [Directed to Calderio] Had he [Dr. Santos] told you that there was no medical malpractice insurance ..., would you have committed to going down there?

A. No, I would not. (1T61–2 to 5.)

Santos contends that he told the women that the price of the surgeries was cheaper because no malpractice insurance was required in the Dominican Republic.

[Santos] ... I told them that the reason why those prices were lower was because labor costs, overhead and no insurance and other things in Santo Domingo that the doctors didn't have to have, that makes the prices going down.

Q. When you say "no insurance," what kind of insurance are you referring to, Doctor?

A. Malpractice insurance. (2T178–4 to 15.)

But Santos acknowledged during his deposition (the relevant portion having been read into the record at trial) that he did not tell the women that he had no malpractice insurance in New Jersey or in the Dominican Republic. (1T25–23 to 1T26–1.) He also acknowledged not telling the women that, if something went wrong during their surgeries, they might not have legal rights in the Dominican Republic. (1T26–2 to 5.) Instead, Santos urged the women to trust him as a licensed New Jersey physician.

Q. [Directed to Santos] And did you not tell them, Doctor, that if they came to your clinic, you could supervise what was going to happen to them because you were ... a licensed doctor in the State of New Jersey and that you could supervise what would happen to these women if they went to the Dominican Republic if they came to your clinic?

· · ·

A. Yes. (2T221–10 to 21.)

**6.** *The check that paid for Shaw's surgery.*

Shaw borrowed the $4,500 that she needed for the operation from her friend, Calderio. (1T61–10 to 19; 1T114–9 to 14.) Initially, Calderio made out a $5,000 check for the surgery, naming Vickie Shaw as payee. (1T65–25 to 1T66–6.) However, in a phone conversation prior to her departure for the Dominican Republic, Shaw says Santos told her that the check for her surgery had to be certified and made out for $4,500 to "Anne Feliciano." (1T113–18 to 1T114–5; 2T98–7 to 22.) At Shaw's request, Calderio then voided the first check and had the bank certify her check in the required amount to Anne Feliciano. (1T114–15 to 23; 1T62–8 to 22.) Both women deny knowing Anne Feliciano. (1T114–6 to 7; 1T62–11 to 12.) Shaw swears that she handed the check to Santos at the airport in the Dominican Republic. (1T118–12 to 23.) Calderio's account was debited for this $4,500. (1T64–17 to 18.)

Santos acknowledges that there were discussions between Shaw and himself regarding the money she would need for the operation. (2T161–16 to 2T182–7.) He acknowledges telling Shaw that the check had to be certified. (2T231–7 to 11; 2T232–9 to 14.) However, he does not remember giving Shaw a name to put on the check (2T182–10 to 15); he claims he told her to bring a certified blank check. (2T233–12 to 14; 2T234–12 to 16.) Santos acknowledges asking Shaw whether she had the check with her when she arrived in Santo Domingo (2T235–22 to 25), but he

denies having accepted the check from her. (2T236–1 to 2.) Santos acknowledges that this check was the one Shaw used to pay for her surgery, (2T235–19 to 21), and that he was paid for his role in Shaw's surgery. (2T191–3 to 16.)

### C. *Credibility and Findings As to Key Disputed Facts.*

This court has assessed the credibility of the trial witnesses. Some key factual differences are, as is natural, a function of differing perceptions, use of language, and recall. However, other differences in fundamental points must be resolved based upon belief of one deponent and disbelief as to conflicting testimony.

In terms of witness demeanor (such as body language, eye contact, manner of speech, completeness of answers, and other subtleties), this court found the plaintiff and her three friends to be particularly credible.

By contrast, Dr. Santos was too often vague in his responses, and as to several key points visibly uncomfortable with his own statements. This court thus questions both the care and truthfulness of his responses in a number of particulars (as will be expanded on below).

Similarly, this court has evaluated *consistency* of witnesses' testimony, as well as the inherent *probability* (or improbability) of their statements. Again, as will be expanded upon hereinafter, the Shaw witnesses proved to be more credible than Santos and his wife.

### 1. *Santos as the surgeon.*

Here, Santos' vagueness is evident. This court believes that Santos promoted himself and his clinic, omitting the explanation that he would actually play but a limited role in Santo Domingo as a surgical assistant. Hence, though he may well have uttered the term "assist" in conjunction with the surgery, he plainly led four relatively unsophisticated surgical candidates to believe that he was the principal surgeon. Understating this key fact is thoroughly consistent with the acts of salesmanship in which Santos was engaged when he met with Shaw (both initially and later in the group session). He could not readily promote CEMIS without touting himself.

Similarly, differences about the understanding of the role of "Dr. Cabral" before Shaw traveled to Santo Domingo must be resolved in favor of the Shaw witnesses. Indeed, if Cabral was to be the principal surgeon and Santos properly exposed this fact, (i) Santos would have described Cabral's specific qualifications in detail, and (ii) at least one of four Shaw witnesses to the Santos sales pitch would have recalled the reference to Cabral. In fact, each time Santos (and his wife) mentioned the disclosure of Cabral's role to Shaw and her friends, their demeanor reflected their discomfort with their own testimony.

Most importantly, Santos never *disclaimed* being a "plastic surgeon." Yet he well knew that his experience in the field was limited to a few courses taken years before 1996, and some service as a surgical assistant. *Santos* had never performed a "tummy tuck," or liposuction, nor by all appearances was he qualified to do this work. Certainly, as he "sold" his services and the virtues of CEMIS to gullible cosmetic surgery candidates, Santos should have *disclaimed* any expertise. Instead, Santos feigned a physical examination of four women, telling each what they wanted to hear about the feasibility of transforming surgery. He did not take any measurements and cannot remember making a written note about any exam (each of which lasted but a few minutes)! (2T222–15 to 225–5.) Yet, in a blatant fabrication,

Santos testified that he was examining the women so as to "have an idea to tell the plastic surgeon." (2T223–4.)

This court finds that Santos knowingly led Shaw to believe that Santos would be the principal surgeon, and thus his references to doctors being up to American standards plainly inferred that *he and his assistants* offshore were qualified *plastic surgeons.*

### 2. CEMIS as site of the surgery.

Santos apparently did tell Shaw and her friends when they met at the Shaw home that his new clinic was still under construction. However, his testimony is thoroughly inconsistent as to whether the clinic would be completed in time for surgery which they might schedule. Indeed, it is logical to conclude from both Santos' testimony and that of his wife that they were hoping for a May 1996 opening.

> [Mrs. Santos] I found out later that he wanted like a surprise for the Mother's Day. (2T136–9–12.)

(The court notes that Mother's Day is an early May event.)

It is unanimously agreed that Santos promoted CEMIS at the Shaw home; the inference to be drawn from that promotion and the brochure was that the new clinic would be ready. Santos was promoting CEMIS and his services. He linked the two by assuring the group that his ownership of the clinic would facilitate his supervision of their care.

This court concludes that Santos never indicated that CEMIS would not be ready for those who would, as a consequence of the sales pitch at the Shaw home, sign up for surgery. None of the four Shaw witnesses heard anything from which they would have drawn a contrary inference. Santos' interests in promoting CEMIS were consistent with his nondisclosure of

the fact that the clinic opening might be delayed. Santos continued to "sell" through the vehicle of his stature as a New Jersey/American physician who was providing a state-of-the-art offshore clinic.

Similarly, this court finds that Shaw was being truthful when she testified that Santos did not disclose to her that CEMIS, in fact, was not ready until Shaw arrived in Santo Domingo.

### 3. Shaw as a Candidate for Three Procedures to be Performed in a Single Session.

Santos' contention that he advised Shaw that the final word about her surgery would be reserved for Dr. Cabral is a complete fabrication. This court is convinced: (i) that Dr. Cabral was not meaningfully mentioned (and no other principal surgeon was touted), while Santos was promoting in the Shaw home (or before); (ii) that Santos' April examination was assurance to Shaw that her multiple requests could be satisfied; (iii) that arrangements to travel and pay cast the die for the single surgery before Cabral ever saw Shaw; and (iv) that Shaw's visit to Cabral the evening she arrived in Santo Domingo and shortly before the next day's surgery, more evidenced Santos' business interests in meeting the schedule than diligent medical assessment. As to this last point, it is simply illogical (i.e., highly improbable) that Shaw would be told of her surgery date and directed to make both travel arrangements (at her expense) and payment arrangements (by certified check), if Santos had not given the green light to Shaw's requested procedures. Imagine the impact on the Santos business promotion if a third party (Dr. Cabral) were to exercise a last-minute veto of the requested surgery.

This court is surprised that Santos could say he told Shaw anything inconsistent with her belief that Santos had already

qualified her for the "full treatment" after the April in-bedroom exam. His demeanor in testifying that he indicated a deference to Cabral reflects, again, prevarication.

This court concludes that, in selling his services and facilities, Santos led Shaw to believe she could be transformed in one surgical sitting. Any contrary conclusion would be inconsistent with his direction to Shaw to invest in a trip to the Dominican Republic to meet a scheduled surgery date. *Selling of services was the driving force in this transaction; medical concerns were simply subordinated.*

### 4. *Offer of a price break.*

The four Shaw witnesses all described price breaks offered by Santos. Santos, vaguely, expressed a belief that he made no such offers. But the "context" belies Santos' purported belief. Santos convinced Shaw to organize, not a Tupperware® party, but a CEMIS–Santos group cosmetic-surgery klatch. Such a promotion is consistent with the notion of group pricing.

This court concludes that Santos offered price breaks at the April meeting in Shaw's house (and before, to Shaw at the diner).

### 5. *Basis for cheaper surgery in the Dominican Republic.*

Santos referred in testimony to the absence of malpractice insurance in Santo Domingo as a factor in reducing the price of cosmetic surgery there. However, it is simply not believable that Santos-as-salesman specifically articulated to Shaw and her friends that medical malpractice insurance coverage was not an overhead item for doctors in the Dominican Republic. Even the manner in which the testimony developed puts the lie to any Santos claim that he expressly referenced medical mal-

practice insurance in the April 1996 meeting. *See* 2T178–4 to 15, where the specific reference to this type of insurance is virtually dragged out of Santos by his lawyer. Moreover, Santos' deposition testimony is to the contrary; he never disclosed this key fact and this court so concludes.

### 6. *The check that paid for Shaw's surgery.*

Shaw's position, amplified by Calderio's testimony, as to the procedure for obtaining a certified check *and* naming of the mysterious "Anne Feliciano" is believable; Shaw's *only* contact regarding *all* arrangements before her arrival in Santo Domingo was Santos. He does not deny telling her to bring a certified check. His explanation about bringing such a check "blank" is simply not credible. Similarly, Santos' testimony (contrary to Shaw's) about Shaw's tender of the check to Santos, is not credible. Santos relates that, while he asked about the check, he did not take it. Shaw, being completely in Santos' hands and following his instructions regarding the check (including "Anne Feliciano" as payee), quite reasonably would have tendered (and the court finds did tender) the check to Santos upon her arrival in Santo Domingo.

This point about the drawing of the check and tendering of it requires some further reflection. First, when Santos testified that he knew no "Anne Feliciano" and thus never gave that name to Shaw, his demeanor was telltale. Santos was, simply put, lying. Santos acknowledged giving Shaw payment instructions—a certified check, but "in blank." Where else could Shaw get the name "Anne Feliciano" but from Santos? And why would she jeopardize her desperately hoped-for surgery by making up a name for the certified check which was to pay for the surgery?

Santos' testimony in this regard moved past the preposterous.

And, after making all arrangements with Santos, it is simply not believable that Shaw would turn the certified check over to anyone other than Santos. In fact, Santos' entire testimony in this regard is a contrivance designed to develop a literal defense to 523(a)(2)(A). That is, Santos was spinning his unbelievable tale so as to deny that he received "money ... obtained by ... fraud."

### D. Composite Finding.

Overall, this court finds that Santos, though contacted through Shaw's initiation, was nevertheless "selling" his services and clinic from the moment his brochure was sent to Shaw. His effort was a commercial promotion, while he masqueraded as a medical advisor.[16] His meeting at the Shaw home in April 1996 was designed to sign up patients *whom Santos would have travel to Santo Domingo for surgery following only the most cursory Santos examination* (lasting a very few minutes). Without recollection of a note having been taken, and without a single measurement having been made, Santos advised his audience that they were candidates for cosmetic surgery *and* undertook to schedule surgery for Shaw (and, initially, Calderio) in Santo Domingo.

P–1 promoted cheap plastic surgery and announced the construction of Santos' new clinic. He held out the rosy potential of combining an island vacation with surgery. And, most significantly, Santos gave clear assurances of the quality of facilities and care in the Dominican Republic by repeated references to "American style," "American techniques," "American training," plainly equating the surgery that Shaw would experience with that available to her in New Jersey.

Shaw put her trust in Santos, relying on him completely as to her well-being in Santo Domingo. Santos knew this, encouraging Shaw by representing that he would "take care of her." In promoting his commercial venture, Santos withheld vital information from Shaw (including the fact that he was not a qualified plastic surgeon, that he would not be the principal surgeon, that CEMIS might not be the surgical site, and that access to medical malpractice insurance was not available). In this case, Santos' business interests trumped good medical practices.

## V. ULTIMATE FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Whether Santos Obtained Money Through Material Misrepresentation.

For purposes of § 523(a)(2)(A), a misrepresentation includes "not only words spoken or written but also any other conduct that amounts to an assertion not in accordance with the truth." RESTATEMENT (SECOND) OF TORTS § 525 cmt. b (1976) (cited hereinafter as "RESTATEMENT"). Courts have frequently held that "a debtor's silence regarding material fact can constitute a false representation actionable

---

**16.** Consider that Santos tried to convince Calderio to continue with her scheduled surgery when she called to cancel because of a *herniated disk.* Similarly, Santos' salesmanship efforts are reflected in Menichella's testimony. (1T76–6 to 1T77–1.) That witness advised Santos at the April 1996 group session in Shaw's home of a cardiac condition which affected her. When the witness asked

Santos if a "release" for proposed cosmetic surgery should be obtained from the witness's cardiologist or her general practitioner, she said Santos advised that such releases were "a little easier" to obtain from the general practitioner. The clear inference is that the potential patient was subtly directed away from the cardiology specialist.

under section 523(a)(2)(A)." *In re Docter-off*, 133 F.3d 210, 216 (3d Cir.1997) (*quoting In re Van Horne*, 823 F.2d at 1288). Moreover, although § 523(a)(2)(A) does not state it directly, to establish the exception to discharge, the false representation must be material. *Field v. Mans*, 516 U.S. at 68, 116 S.Ct. 437. An untruth is material if, for example, it is considered important enough to influence a creditor's decision to extend credit. "Material falsity has been defined as 'an important or substantial untruth.'" *Insurance Company of North America v. Cohn (In re Cohn)*, 54 F.3d 1108, 1114 (3d Cir.1995) (citation omitted). The creditor has the right to know the facts "touching upon the essence of the transaction." *In re Van Horne*, 823 F.2d at 1288.[17]

1. *Santos falsely represented to Shaw that she was a candidate for a three-in-one surgery: tummy tuck with liposuction and other liposuction procedures on her flanks, knees and upper arms.* (1T101–5 to 1T102–3.)

The undisputed expert testimony of Anthony Berlet, M.D., spelled out the high risk of these simultaneous surgeries. Referring to physiological diagrams and actual photographs of Shaw, Berlet concluded that liposuction of Shaw's flank areas performed at the same time as her abdominoplasty, in combination with her preexisting gall bladder scar, assured that the blood supply to the abdominal area would be cut off. Necrosis would develop. 2T62–3 to 63–9. Berlet opined:

[In the Dominican Republic] [t]he patient had had abdominal plasty [sic] with liposuction of her arms, flanks, upper abdomen, hips, outer thighs and inner thighs.... (2T57–5 to 10.)

Ideally, you'd step them. You'd stage the procedures ... You'd do the abdominal plasty [sic] at one sitting and you'd go back and go [sic] a liposuction several months later .... it's not uncommon to do a liposuction, say, on the hips or arms at the same time. That would be considered okay ... [*b*] *ut that upper abdomen flank area that was shown is highly recommended against.* (2T64–18 to 2T65–3, emphasis added.)

Berlet's testimony, *with certainty*, established the jeopardy faced by Shaw in submitting to these multiple procedures because of her prior medical history.

Q. [Directed to Berlet] With regard to Ms. Shaw's prior medical history, prior to going to the Dominican Republic to have the surgery, is there any[thing] significant about her medical history, sir?

A. Prior to that she had had gall bladder surgery, which had—would affect the ultimate result. (2T16–3 to 8.)

Q. Doctor, on a scale of one to ten, with ten being the worst and one being the best, if you do—if a doctor did a liposuction of the flank area and an abdominal plasty [sic] without the gall bladder, how bad would it be?

A. It would probably be an eight out of ten.

Q. And if a doctor did it when the patient had already had that gall bladder surgery, how bad would that be?

**17.** Similarly, to be actionable under the New Jersey Consumer Fraud Act, a misrepresentation must be material to the transaction and it must be a "statement of fact, found to be false, and made to induce a buyer to make a purchase." *Gennari*, 148 N.J. at 607, 691 A.2d 350.

A. *It would be a ten out of ten. It's just an obvious no no.* (2T64–1 to 9, emphasis added.)

2. *Santos falsely represented to Shaw that the surgeons and surgical techniques he would provide in Santo Domingo were up to American standards.*

This point, a corollary to the "three-in-one" misrepresentation, was further established by Berlet.

Q. Doctor, do you have an opinion to a reasonable degree of medical probability whether these surgeries—... was [sic] to the standard of American technique surgery and care?

. . .

A. It fell short of that standard, significantly fell short of that standard.... (2T57–14 to 25.)

Rather than providing the American standard of treatment, Santos delivered bad medicine, indeed the worst (*"ten out of ten"*). And, it was not only the three-in-one blunder which Berlet exposed. Even the arm and leg liposuctions were ill-performed. *See generally* 2T17–2 to 20–11; 2T32–20 to 33–15. ("One arm appeared as if a shark had taken a bite out of it and the other arm had multiple irregularities." 2T509–23 to 25.)

3. *Santos falsely represented to Shaw, by his silence and inference, that he was a qualified plastic surgeon and that he would "take care of her" in that capacity.*

By Stipulation, it is established that Santos (as of 1996) had never performed plastic surgery as a principal physician. His "experience" in the field was limited to two courses taken many years earlier, and simple assistance in a limited number of operations performed by others. Specifi-

cally, the Stipulation provides (at its p. 128–6 to 13):

Q. So other than being an assistant you never performed liposuction surgery?

A. Never.

Q. With regard to the cosmetic surgery, had you ever performed any cosmetic surgery over the surgeries that you told us that you assisted Dr. Wasserstrum?

A. Never.

Rather than disclose his inexperience, Santos pretended to be expert. He was "selling" his CEMIS venture, cheap "American-style" cosmetic surgery, as if he had the medical credentials. The physical exam-charade which he conducted at the Shaw home bolstered the false image Santos was projecting.

Q. [Directed to Santos] Now, Doctor, when Ms. Shaw spoke to you didn't she ask you about your qualifications as a surgeon? ... Didn't she tell you that she'd been checking around to find out what your qualifications were, to find out what they were *because you were a doctor in the United States?* [Emphasis added.]

A. She mentioned she had spoke about me with some people. (2T212–22 to 2T213–3.)

. . .

Q. [Directed to Santos] And did you also tell them, Doctor, that if they came to your clinic, *you could supervise what was going to happen to them because you were ... a licensed doctor in the State of New Jersey.*

. . .

A. Yes. (2T221–10 to 16, emphasis added.)

Santos had the obvious opening at Shaw's home or earlier, at the diner meeting, to clear the air and disclose his inexperience. Instead of being truthful, he allowed Shaw and her friends to believe that he, *Santos,* was expert. They were, in fact, being examined by Santos, and in their minds this physical exam was being done by the expert surgeon who was offering to operate on them.

4. *Santos falsely represented other significant particulars of Shaw's exposure to surgery in Santo Domingo.*

Santos conveniently failed to disclose to Shaw that the surgeons operating on her offshore would not be covered by medical malpractice insurance. In fact, by falsely leading Shaw to believe (up to the time of her arrival in Santo Domingo) that he was to be the principal plastic surgeon, Santos allowed Shaw the misplaced comfort of believing that American/New Jersey practices were being replicated offshore. Such practices would include expected coverage. Moreover, holding out the prospects of the new, state-of-the-art CEMIS facility, extended the "New Jersey–on–the–Caribbean" aura being promoted by Simon B. Santos, M.D.

Thus, contrary to Santos' stated or implied representations, no malpractice insurance covered Shaw's surgeons; Santos was in reality only a bit-player in the operating theater; and CEMIS was not yet open for business.

B. *Whether Santos Knew His Misrepresentations Were False, Or He Made Them in Reckless Disregard of the Truth.*

One asserting a claim of fraud must show that the defendant acted with scienter. *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1182 (3d Cir.1993). *See also Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The elements of scienter are (1) knowledge of the falsity of the representation; and (2) "an intention to obtain an undue advantage therefrom." *Farris v. County of Camden,* 61 F.Supp.2d 307, 345 (D.N.J.1999) (*quoting Bonnco Petrol, Inc. v. Epstein,* 115 N.J. 599, 609 (1989)). To satisfy scienter or the knowingly false element of § 523(a)(2)(A), a misrepresentation must be made with either actual knowledge of its falsity, or with such reckless disregard of the truth that the law will impute the knowledge to the responsible party. *New York Life Ins. Co. v. Marotta,* 57 F.2d 1038, 1039 (3d Cir. 1932). "In assessing a debtor's knowledge of the falsity of the representation ... the Court must consider the knowledge and experience of the debtor." *FTC v. Duggan (In re Duggan),* 169 B.R. 318, 324 (Bankr.E.D.N.Y.1994). "A false representation made under circumstances where a debtor should have known of the falsity is one made with reckless disregard for the truth and this satisfies the knowledge requirement." *Id.*

The knowing element of fraud can be established in any of the following three ways: (1) the representation was made with actual knowledge of its falsity; (2) it was made without knowledge either of its truth or falsity; or (3) the representation was made under circumstances in which the person making it ought to have known, if he did not know, of its falsity. *See Hanft,* 274 B.R. at 922. *See also* RESTATEMENT § 526; *Island Insteel Systems, Inc. v. Waters,* 296 F.3d 200, 212 (3d Cir.2002); *Seaboard Surety Co. v. Permacrete Constr. Corp.,* 221 F.2d 366, 375 (3d Cir.1955); *Cruz v. Cohen (In re Cohen),* 191 B.R. at 605; *Derry v. Peek,* 14 App. Case. 337 (H.L.1889) (judgment of Lord Herschell).

Santos, as an American surgeon licensed to practice in New Jersey, was embarking

on a new commercial venture. It must have been apparent that Shaw and her friends would be trusting people, and were unsophisticated in medical matters. Santos held out the rosy picture of cosmetic surgery in vacationland while knowingly omitting key information that would undercut his salesmanship.

Santos knew or plainly should have known:

(i) that scheduling surgery in Santo Domingo within a day of Shaw's arrival and before the actual surgeon could examine the patient cast the die for risk taking at Shaw's expense;

(ii) that while he was not going to be the principal surgeon because he was not qualified as such, Santos was encouraging Shaw to rely on him as if he were the principal surgeon;

(iii) that he had let his medical malpractice insurance lapse and that Cabral had none;

(iv) that CEMIS might not be ready at the time scheduled for Shaw's surgery; and

(v) that his expression of what was taken as an expert medical opinion—the "approval" of multiple procedures in a single surgical session—was the wishful statement of an inexperienced amateur.

In addition, this court finds that Santos was promoting when he equated surgeons and cosmetic surgery techniques in Santo Domingo with those in New Jersey. Indeed, Santos was unqualifiedly and unconditionally endorsing offshore surgery for Shaw, an endorsement not based upon any fact that he was willing to put forth at trial. At best, Santos' endorsement of Dominican Republic cosmetic surgery was made with reckless disregard for whether it was true or not. And, the only record before this court is that Shaw was subjected to surgery by a surgeon who should not have scheduled the single session set of procedures and who performed other procedures dismally. Neither Cabral nor any other cosmetic surgeon worth his/her salt (*in any locale*) should have operated on Shaw so as to cut off the blood supply to the abdominoplasty flap. Whether or not Santos actually knew that Cabral was going to blunder so colossally is not the point. Rather, Santos knew that commercial interests were being promoted at the expense of good medicine.

### C. *Whether Santos Intended to Deceive Shaw.*

In order to deny the discharge of a debt because of a debtor's false representation, the burden is on the creditor to prove that the debtor made a false representation with the intention of deceiving the creditor. *Schweig*, 780 F.2d at 1579.

A person who makes a statement as if it were positively a fact "engages in a 'conscious deception' if he realizes he does not know the truth of his statement, even though he honestly believes its truth. In such a case, the person is deemed to have the intent to deceive (scienter), but not so much as to the fact itself, but rather as to the extent of his information." *Palmacci*, 121 F.3d at 787 (citations omitted). Moreover, such intent does not require a finding of malevolence; it requires only a showing of an intent to induce the creditor to rely and act on the misrepresentations made. *Merchants National Bank of Winona v. Moen (In re Moen)*, 238 B.R. 785, 791 (8th Cir. BAP 1999).

While fraud supporting nondischargeability may not be implied in law, it

may be inferred as a matter of fact.[18] *Palmacci* 121 F.3d at 789. "The finder of fact may 'infer[ ] or imply[ ] bad faith and intent to defraud based on the totality of the circumstances when convinced by a preponderance of the evidence.'" *Id.* (citations omitted.) Moreover, "[b]ecause direct proof of intent (i.e., the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred.... The focus is, then, on whether the debtor's actions 'appear so inconsistent with [his] self-serving statement of intent that the proof leads the court to disbelieve the debtor.'" *Van Horne*, 823 F.2d at 1287–88. *See also Rembert*, 141 F.3d at 282 ("Intent to deceive may be inferred from the totality of the circumstances of a case"); *American Express Travel Related Serv. Co. Inc. v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1125 (9th Cir.1996), *cert. denied*, 520 U.S. 1230, 117 S.Ct. 1824, 137 L.Ed.2d 1031 (1997) ("It [intent to deceive] may be inferred when the facts and circumstances present a picture of deceptive conduct on the debtor's part").

This court finds, specifically, that Santos was engaged in a conscious deception, maneuvering Shaw (as described throughout this opinion) toward dangerous offshore surgery in order to promote his commercial venture. Santos, without informing Shaw of the actual risk she was to undertake and apparently feeling that he was unfettered by American/New Jersey practice restraints, hawked his wares: cheap, offshore cosmetic surgery.

At trial Santos did not utter a single word in defense of the actual quality of the Shaw surgery. Nor did Santos attempt to justify his "American quality and techniques" statements. In fact, none of Santos' misrepresentations had any overtones of honest mistake.

### D. Whether Shaw Justifiably Relied Upon Santos' Misrepresentations.

A person alleging pecuniary loss as a result of fraudulent misrepresentation by the debtor must further show that he relied in fact upon the misrepresentation, that the reliance was a "substantial factor" in causing his loss, and that the reliance was justifiable. RESTATEMENT § 537 cmt. a and b; 546 cmt. a and b.

The Supreme Court adopted the following standard for justifiable reliance:

**18.** *See* Page Keeton, *Fraud: The Necessity for an Intent to Deceive*, 5 U.C.L.A. L. REV. 583, 595–97 (1958).

[T]he courts ... either permit[ ] or requir[ ] an inference of dishonesty to be drawn when a statement is made of one's knowledge which is false and when no evidence is introduced to explain the basis for any mistake or error that might have been made. Both reasons of probability and fairness justify such a treatment. The probability is that when a false statement is made indicating a conviction about a matter that is regarded as being susceptible of knowledge, the declarant is dishonest, and this is especially true when he makes no effort to explain.... If an alleged misrepresenter elects to take the position at the trial that he made no such statements as that which plaintiff imputes to him, and chooses to rely on this position entirely without making a showing of how he could have been in good faith if he had made such a statement, then it is not unreasonable to infer that he had no reliable information.... When evidence is introduced indicating the informational basis for the misrepresenter's honest belief, if he had such, of the truth of the matter asserted, it may be that the information is so unreliable as to be insufficient to justify a reasonable belief, or it may be sufficiently reliable to cause such a belief without being sufficient to justify a reasonable certainty. In both such cases it may be inferred that the misrepresenter had misstated his state of mind with respect to his belief or conviction.

Although the plaintiff's reliance on the misrepresentation must be justifiable ... this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than the application of a community standard of conduct to all cases.

*Field v. Mans,* 516 U.S. at 70–71, 116 S.Ct. 437 *quoting* RESTATEMENT § 545A cmt. b.[19] This has been interpreted as a "minimal threshold," *In re Biondo,* 180 F.3d 126, 135 (4th Cir.1999), one requiring a "fairly low" showing, *In re Guske,* 243 B.R. 359, 363 (8th Cir. BAP 2000).

■ Even though justifiable reliance permits a person to rely "on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation' " (*Field v. Mans,* 516 U.S. at 70, 116 S.Ct. 437 *quoting* RESTATEMENT § 540), that person is:

> required to use his sense, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.

*Field v. Mans,* 516 U.S. at 71, 116 S.Ct. 437, *quoting* RESTATEMENT § 541 cmt. a.

■ Thus, the purported victim of a misrepresentation is required to assess that representation in light of his particular knowledge or experience in the circumstances of the case:

> [J]ustifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and ... '[i]t is only where, under the circumstances,

the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.'

*Id.* at 71–72, 116 S.Ct. 437 (*quoting* W. PROSSER, LAW OF TORTS § 108, p. 718) (4th ed.1971) (the edition available in 1978 when the Bankruptcy Code was promulgated). The treatise continues: "The matter seems to turn upon an individual standard of a plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case." *Id.* at 72, 116 S.Ct. 437 (*quoting* PROSSER, supra, § 108, p. 717).

Applying the justifiable reliance standard to the facts of this case and to Shaw, this court focuses first on the relative positions of the parties. Shaw was 52 years old when she first encountered Santos. (1T86–12–14.) She was employed as a receptionist in the Passaic City Hall, (1T86–22 to 23), and overheard a conversation about Santos' new cosmetic surgery clinic in Santo Domingo. (1T86–23 to 1T 87–1.) Though a person of modest means (and, in fact, without the funds for even Santos' low-cost services), Shaw would eventually "desperately" want the surgery. (1T114–11 to 14.)

In Shaw's eyes, Santos was a well-qualified doctor *"from the United States."*

> I trusted Dr. Santos because he was a doctor from the United States, and I felt like, he knows what he's talking about; he's going to protect me; it's not like I came here [to Santo Domingo] with my eyes closed to meet some quack.... I

---

**19.** The justifiable reliance standard established for actual fraud exceptions to discharge by *Field v. Mans* applies also to cases of false representation. *Marra, Gerstein & Richman v. Kroen (In re Kroen),* 280 B.R. 347, 351 (Bankr.D.N.J.2002). *See also In re Reynolds,* 197 B.R. 204, 205 n. 2 (Bankr.D.N.J.1996).

just felt like I—that he knew what he was doing. I put my life in his hands. I felt that if he took me there to have surgery he knew what he was talking about at that point. So I didn't back out. (1T122–13 to 21.)

And, in fact, Santos was a licensed New Jersey physician. So, the patient who was anxious for cosmetic surgery (at affordable rates) relied on the trusted physician.

Shaw was not alone in her reliance on Santos. Her peers, *similarly situated friends,* testified that they felt assured by Santos' presentation to them.

[Mann] I felt assured that I would have the medical treatment that I would have in the United States. (1T44–17 to 18.) [Calderio] The training was the same training that was done here. The surgeons—he's a surgeon here. He's a doctor here. He'd be performing the same thing he would be doing here, there. (1T52–6 to 8.) Well, the fact that it was going to be a new clinic. We were going to actually be the first people in this facility. It was just very reassuring, what was going to be done. That's why I did commit that day. (1T56–10 to 13.) [Menichella] Another thing, he was going to perform these operations. What he was going to have is American trained assistants and technicians and, you know, like we were led to believe, got told by him if I remember right, that he was the gentleman that was going to be doing this, because we were all concerned about who was operating on us, and he did assure us he was the man doing it and he has all these assistants. (1T72–14 to 20.) And it was going to be even a little better than your average hospital because it's brand new. It was going to have like new, modern technology there.

. . .

Equipment and everything like that. *So we were even led to believe it might be a little better just it was brand new.* (1T72–25 to 1T73–5, emphasis added.)

Moreover, Santos performed actual physical examinations of Shaw and her friends, a guise which added to the seeming professionalism of the physician as viewed by the four potential patients.

[Shaw] I questioned him about the surgery I was interested [in] and I said, would the method be the same techniques as in the United States because I was concerned, and he said that all the techniques and technology would be according to American standards and the State of New Jersey. (1T107–9 to 13.)

[Shaw] Dr. Santos examined my stomach, the areas I was interested. He examined my legs, which I—my knees, which I felt were too fat. He examined my arms and *he told me that I was a candidate for those three surgeries.* (1T101–5 to 8, emphasis added.)

[Mann] I was concerned about the area where I wanted, which was the liposuction . . . And I had prior surgery and I was concerned about the keloid on my breast. So that was a question that I had asked the doctor. And he stated it wouldn't be a problem. . . . I had high blood pressure and I asked—and I let the doctor know that. He said, are you under medication; I said yes. He also stated that wouldn't be a problem because it was controlled blood pressure. (1T39–1 to 21.)

[Menichella] I had one other big concern. I have a heart problem . . . . he [Santos] had told us when we were outside we would have to get clearances from our doctors. So I had said to him, who do I go to? Do I go to my cardiologist or do I go to my general practitioner? . . . he [Santos] says, no it shouldn't

be a problem but you do have to get a release; I would suggest you go to a general practitioner because it's a little easier to get a release there. (1T75–6 to 1T 77–1.)

Though Santos was "selling," Shaw and her friends truly believed they were already in the hands of an expert New Jersey physician who was giving them medical advice which would lead to their physical transformations.

Shaw's *actual reliance* on Santos' representations is undeniable, given that she submitted to surgery offshore. Likewise, it is clear that Santos' convincing portrayal of the benefits of the Santo Domingo surgery was the decisive (and thus "substantial") factor in attracting Shaw to the Dominican Republic for cosmetic surgery. Her testimony is consistent in these regards.

Q. If Dr. Santos had told you before you went to the Dominican Republic that the clinic had not been ready, would you have gone?

A. Absolutely not.

    . . .

Q. If Dr. Santos had told you that there was no aftercare clinic for your intake— . . . would you have gone?

A. Absolutely not.

    . . .

Q. Had Dr. Santos told you that the surgery that you were going to get was not up to American standards or was not the same techniques, would not be the same surgeries, would you have gone?

    . . .

A. No, I would not have gone. (1T129–14 to 1T130–12.)

■ This court concludes that Shaw has satisfied the justifiable reliance standard of *Field v. Mans*. Shaw actually relied on Santos' sales pitch, which was the singular source of her information about the surgery. In trusting Santos, Shaw was joined by her peers (evidence justifying her reliance). More fundamentally, Shaw, a person of lesser sophistication as to medical matters, was justified in relying on Santos, a physician having standing as a professional in her eyes. "Where the means of obtaining information are not equal the positive representations of the person who is supposed to possess superior means of information may be relied on." *Hughes v. Consol–Pa. Coal Co.*, 945 F.2d 594, 614 (3d Cir.1991) (citation omitted).

### E. *Whether Shaw Suffered Damages Which Were Proximately Caused by Santos Misrepresentations.*

■ Proximate causation, i.e., loss or damage to the creditor "as a proximate result of" the debtor's misrepresentation, is a final element that must be proved in order to establish nondischargeability under § 523(a)(2)(A). *United States v. Spicer*, 57 F.3d 1152, 1157 (D.C.Cir.1995). Proximate causation encompasses two elements, "causation in fact" and "legal causation." *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 73 (3d Cir.1996); *Redland Soccer Club, Inc. v. Dept. of the Army of the U.S.*, 55 F.3d 827, 851 (3d Cir.1995); *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 366–367 (3d Cir.1990).

■ "If the misrepresentation has in fact induced the recipient to enter into the transaction, there is causation in fact of the loss suffered in the transaction.... [T]he plaintiff must have relied upon the misrepresentation in incurring the loss." RESTATEMENT § 546 cmt. a and b. Causation in fact can be established through evidence demonstrating that the debtor's false statements induced the creditor to enter into an agreement with the debtor for his services and that the misrepresentation was a substantial factor in influenc-

ing the creditor's decision. *Gem Ravioli,* 271 B.R. at 219.

■ By contrast to factual causation, "[m]isrepresentation is a legal cause only of those pecuniary losses that are within the foreseeable risk of harm that it creates.... This means that the matter misrepresented must be considered in the light of its tendency to cause those losses and the likelihood that they will follow." RESTATEMENT § 548A cmt. a and b. Legal causation can be established through evidence showing that the creditor's loss could reasonably have been expected to result from its reliance on the debtor's misrepresentation. *Gem Ravioli,* 271 B.R. at 221.

■ Malpractice is a foreseeable result of any medical procedure and proximate cause can be proven if the debtor fraudulently induced the creditor to undergo a procedure that was then negligently performed. *In re Gergely,* 110 F.3d at 1453 (citing *Britton,* 950 F.2d at 604–605). Thus, in *Britton,* the fraud arising from the pretense of the cosmetic surgeon's employee that the employee was a medical doctor, a pretense which factually caused the plaintiff-creditor to undergo surgery, also served as proximate causation linked to negligent performance of that surgery.

> [A]lthough Britton did not anticipate that Dr. Cavanaugh might perform the operation negligently, it was foreseeable that injury to Price would result from Britton's intentional misrepresentation ... We would draw too fine a line if we concluded that harm was not substantially certain to result from Britton's misrepresentation and inducement.

*Britton,* 950 F.2d at 605. Similarly, in *Church v. Hanft* the bankruptcy court

found that proximate cause existed between a debtor-physician's fraud in failing to disclose that he was practicing without both a license and insurance and the resulting malpractice in failing to diagnose the patient's tumor. *Church,* 274 B.R. at 923. "Were it not for Dr. Hanft's fraudulent representation that he was a doctor, Ms. Church would never have put herself in the situation where Dr. Hanft could have committed malpractice on her." *Id.*

Santos' knowing and intended misrepresentations to Shaw accomplished their purpose: Shaw signed on for cosmetic surgery in the Dominican Republic. Factually, Santos' promotional efforts led directly to the mishandled surgery.

And, because of Santos' professional status and his pretense as to cosmetic surgery expertise, he did more than simply sell Shaw on surgery. Santos sold her on a "one-trip" program and tight scheduling,[20] all contrary to any concept of good medical practice. Santos was obviously the promoter of Shaw's trip to Santo Domingo, a status which by itself would be the factual cause of her damages. In addition, *Santos' business interests influenced the actual surgery.*

Malpractice, as in *Gergely* and *Britton,* is a foreseeable result of medical procedures and surgery. *A fortiori,* where a licensed physician, pretending to be an expert, actively participates in the "engineering" of surgery, his promotional efforts are the proximate cause of any ill-advised and wrongly performed resulting surgery.[21]

Santos through his misrepresentations caused, in factual and legal terms, Shaw's damages.

---

**20.** Shaw flew to Santo Domingo on May 24, 1996, saw Dr. Cabral for the first time that evening, and was operated on the following day. She stayed in the hospital until May 27, 1996. 1T118–7 to 11; 1T123–1 to 2; 1T124–9 to 14.

**21.** In terms of her postoperative care, Dr. Berlet testified as to Shaw's departure from

## VI. CONCLUSION

Debtor, Simon B. Santos, M.D., obtained money from Victoria Shaw by false pretenses, false representations and actual fraud. The debt due Shaw is thus excepted from Santos' discharge pursuant to 11 U.S.C. 523(a)(2)(A).

Shaw will have the opportunity to liquidate her claim and otherwise assert aspects of her claim not resolved here, in the pending but long inactive state court proceeding. The stay against continuing that litigation has terminated. *See* 11 U.S.C. 362(c)(2)(C).[22] Both parties have those rights afforded them by 28 U.S.C. 157(b)(5) as those rights relate to damages and other unresolved claim issues.

To the extent that this court might be deemed to have subject matter jurisdiction to liquidate Shaw's personal injury damages associated with Santos' fraud, this court abstains in favor of *the pending* state court proceeding.[23] *See* 28 U.S.C. 1334(c)(1); 11 U.S.C. 105(a).

A separate implementing Order and Judgment shall issue this date.

the Dominican Republic against Santos' advice (at a time when her hemoglobin level was half the norm). "She probably ended up saving her life by getting out." 2T88–19 to 2T89–2.

**22.** Except for the Shaw claim, the discharge of Santos' debt was effected on September 24, 2001; to make sense out of 362(c)(2)(C), the stay as to Shaw's actions would thus terminate with the Order and Judgment implementing this Opinion. Consider the inverse circumstance where the exception to discharge determination predates an 11 U.S.C. 727 denial of discharge (or the issuance of the discharge). In this regard, *compare and contrast Boatmen's Bank of Tenn. v. Embry (In re Embry)*, 10 F.3d 401 (6th Cir.1993) (exception to discharge determination terminates stay as to excepted creditor's actions against non-estate property); and *Cardillo v. Moore–Handley, Inc. (In re Cardillo)*, 172 B.R. 146 (Bankr. N.D.Ga.1994) (stay continues, notwithstanding exception to discharge determination, until 727 discharge is denied generally or other statutory event terminates stay).

**23.** *Caveat:* 11 U.S.C. 108(c) (though there is no "tolling" of the period of limitations during the pendency of the stay, if the period would otherwise have expired during the stay, it is extended to thirty days after notice of the lifting/termination of the stay).